**ROMAN CATHOLIC DIOCESE OF ALLENTOWN, Petitioner**

v.

**BUREAU OF WORKERS' COMPENSATION, FEE REVIEW HEARING OFFICE (LEHIGH VALLEY HEALTH NETWORK), Respondent.**

Commonwealth Court of Pennsylvania.

Argued Sept. 13, 2011.

Decided Oct. 28, 2011.

Reargument Denied Dec. 19, 2011.

Dennis P. Cullen, Jr., Lemoyne, for petitioner.

Kelly Smith Watkins, Allentown, for respondent Lehigh Valley Health Network.

BEFORE: SIMPSON, Judge, and BUTLER, Judge, and QUIGLEY, Senior Judge.

OPINION BY Judge SIMPSON.

In this appeal involving the trauma center exemption from the medical fee caps in the cost containment provisions of the Workers' Compensation Act [1] (Act), the Roman Catholic Diocese of Allentown (Employer), self-insured, petitions for review of an order of Hearing Officer Richard C. Lengler (Hearing Officer), of the Bureau of Workers' Compensation, Fee Review Hearing Office (Bureau). Hearing Officer affirmed the Bureau's decision di-

1. Act of June 2, 1915, P.L. 736, *as amended*,   77 P.S. §§ 1–1041.4, 2501–2708.

recting Employer to pay the Lehigh Valley Health Network (Provider) 100 percent of its billed charges for acute care provided to Father James Mulligan (Claimant) for immediately life-threatening or urgent injuries at Provider's Lehigh Valley Hospital–Cedar Crest (Hospital), which is an accredited level I trauma center.

Employer contends Hearing Officer: erred in failing to dismiss Provider's fee review application as untimely; erred in failing to reverse the Bureau's decision because competent and credible evidence produced at the fee review hearing showed Claimant's injuries did not constitute "immediately life-threatening" or "urgent" injuries for purposes of the trauma center exemption as defined by 34 Pa.Code § 127.128;[2] and violated Employer's constitutional right to due process by precluding Employer from presenting expert medical testimony by telephone at the fee review hearing. For the reasons that follow, we affirm.

## I.  Background

### A.  EMS Transport

In early January 2009, Claimant, a 72–year old male, sustained a work-related injury when he fell on an icy sidewalk and injured his back. Claimant remained outside for about five minutes before someone found him. An EMS ambulance unit responded within 10 minutes of dispatch. At the scene, Claimant complained of severe back pain and also stated he hit his head. Claimant did not lose consciousness. The EMS unit immobilized Claimant. He refused a cervical collar and gave a history

---

2. Section 127.128 of the Workers' Compensation Medical Cost Containment (MCC) regulations, 34 Pa.Code § 127.128, provides, in pertinent part:

*(a) Acute care provided in a trauma center or a burn facility is exempt from the medical fee caps, and shall be paid based on 100% of usual and customary charges if the following apply:*

*(1) the patient has an immediately life-threatening injury or urgent injury.*

*(2) Services are provided in an acute care facility that is one of the following:*

*(i) A level I or level II trauma center, accredited by the Pennsylvania Trauma Systems Foundation. . . .*

*. . . .*

*(b) Basic or advanced life support services, as defined and licensed under the Emergency Medical Services Act, provided in the transport of patients to trauma centers or burn facilities under subsection (a) are also exempt from the medical fee caps, and shall be paid based on 100% of usual and customary charges.*

*(c) If the patient is initially transported to the trauma center or burn facility in accordance with the American College of Surgeons' (ACS) triage guidelines, payment for transportation to the trauma center or burn facility, and payments for the full course of* *acute care services by all trauma center or burn facility personnel, and all individuals authorized to provide patient care in the trauma center or burn facility, shall be at the provider's usual and customary charge for the treatment and services rendered.*

*(d) The determination of whether a patient's initial and presenting condition meets the definition of a life-threatening or urgent injury shall be based upon the information available at the time of the initial assessment of the patient. A decision by ambulance personnel that an injury is life-threatening or urgent shall be presumptive of the reasonableness and necessity of the transport to a trauma center or burn facility, unless there is clear evidence of violation of the ACS triage guidelines.*

*(e) The exemptions in subsections (a) and (b) also apply where a patient has been transferred to a trauma center or burn facility pursuant to the ACS High–Risk Criteria for Consideration of Early Transfer.*

*. . . .*

(g) The medical fee cap exemptions may not continue to apply for payments for acute care treatment and services for life-threatening or urgent injuries following a transfer from a trauma center or burn facility to any other provider.

34 Pa.Code §§ 127.128(a)-(e), (g) (citation omitted).

of a fused cervical spine. EMS contacted Hospital's medical command center and transported Claimant to Hospital.[3] At all relevant times, Hospital was an accredited level I trauma center.

### B. Hospitalization

Shortly after Claimant's admission by nursing staff as an acuity level III patient, Provider's physicians determined Claimant's injuries included two unstable spinal fractures. Therefore, they ultimately admitted him as a trauma patient and placed him in Hospital's Trauma–Neuro Intensive Care Unit (Trauma–Neuro ICU).[4] Patients who do not have immediately life-threatening or urgent injuries are not typically placed in the Trauma–Neuro ICU. Approximately two days later, Claimant underwent spinal surgery. He remained a trauma patient until his discharge on January 23, 2009.

### C. Provider's Bill

Employer accepted Claimant's injuries as work-related. In May 2009, Provider submitted a detailed bill on the proper forms to Employer with copies of medical records relevant to treatment. *See* Reproduced Record (R.R.) at 846a–74a. Provider's bill totaled $406,338.79. *Id.* at 848a, 874a.

### D. Employer's EOB/Payment

In November 2009, Employer issued an explanation of benefits (EOB) that approved payment to Provider under workers' compensation fee schedule for inpatient hospital services in the amount of $142,196.00. *See id.* at 875a–77a. Employer issued a check for this amount. *Id.* at 878a. In short, Employer reduced Provider's charges by $264,142.79. *Id.* at 877a.

### E. Fee Review Application/Bureau Determination

Three days after receiving Employer's EOB, Provider filed a fee review application challenging the amount of payment. *Id.* at 1a–2a. The Bureau determined Provider was entitled to the full amount of its bill and directed Employer to pay the outstanding $264,142.79 plus interest. *Id.* at 3a–9a. Employer filed an appeal and requested a fee review hearing. *Id.* at 10a–19a.

### F. Hearing

At hearing, Employer's fee auditor/reviewer and assets recovery specialist, Sean McLaughlin (Insurance Auditor) testified as an expert. Auditor testified he is the president and chief executive officer of Liberty Assets Recovery, a company that audits and reviews medical bills for insurance carriers in workers' compensation cases. He is familiar with the Act's medical cost containment provisions and the ACS field triage guidelines. Insurance Auditor reviewed Claimant's medical documentation and opined that Claimant's inju-

---

**3.** Regarding pre-hospital trauma care, the ACS field triage guidelines provide a flowchart including four steps intended as guides for EMS personnel in determining whether to transport patients to trauma centers. *See* Reproduced Record (R.R.) at 957a. Step One assesses physiology or vital signs. Step Two considers the anatomy of the injury. Step Three considers the mechanism of injury. *Id.* Step Four addresses special considerations including age (risk of death from injury increases after age 55). If any of these conditions in Step Four are present, EMS personnel should contact medical control and consider transport to a trauma center. *Id.* The triage guidelines further provide, "When in doubt, transport to a trauma center." *Id.*

**4.** Pursuant to the ACS guidelines for interhospital transfer, a spinal fracture is considered a life-threatening or urgent injury because it could lead to paralysis. *See* R.R. at 961a.

ries were not immediately life-threatening or urgent for purposes of trauma transport and hospitalization.

Employer also sought to present medical testimony by telephone from Dr. Steven Feinstein (Employer's Physician). However, Hearing Officer sustained Provider's objection and precluded Employer's Physician's testimony on the basis that Employer did not identify Physician as an expert or a telephone witness in its pre-hearing filing as required by the Bureau's pre-hearing instructions.

Dr. Michael Pasquale (Provider's Physician), testified for Provider. He opined that spinal fractures, particularly if they are unstable, are considered immediately life-threatening or urgent injuries. Spinal cord injuries may result in paralysis, especially in elderly patients. Therefore, Provider's Physician opined any patients with spinal injuries should be evaluated at a trauma center.

Provider's Physician further testified the ACS guidelines concerning inter-hospital transfers also list spinal fractures as life-threatening injuries requiring transfer to a level I or level II trauma center. *See* ACS Guidelines for Inter-hospital Transfer; R.R. at 960a–62a. Provider's Physician testified the standards for inter-hospital transfers are the same as those for initial transfers of trauma patients.

Provider's Physician also testified he reviewed Claimant's medical records. Hospital's trauma service evaluated Claimant in the emergency room and diagnosed two unstable spinal fractures. Hospital then admitted him as a trauma patient in the Trauma–Neuro ICU. Claimant remained a trauma patient throughout his stay at Hospital.

Provider also presented testimony from its director of patient financial services, Jeff Hinkle (Financial Services Director),

who testified Provider maintained its certification as a level I trauma center for the past 20 years. Therefore, Hospital was accredited as a level I trauma center at the time of Claimant's admission and treatment.

## G. Hearing Officer's Decision

In December 2010, Hearing Officer issued a decision affirming the Bureau's administrative decision. He recognized Employer maintained the burden of proving by a preponderance of the evidence that it properly reimbursed Provider. 34 Pa. Code § 127.259(f); *Royal Ins. v. Dep't of Labor & Indus., Bureau of Workers' Comp. (Spine Ctr.)*, 728 A.2d 401 (Pa. Cmwlth.1999).

Hearing Officer first determined Provider timely filed its fee review application within three or four days after Employer's notification of disputed treatment through its EOB. Pursuant to Section 306(f.1) of the Act, a provider may file a fee review application within 30 days following notification of disputed treatment if more than 90 days elapsed from the original billing date. 77 P.S. § 531(5); *Harburg Med. Sales Co. v. Bureau of Workers' Comp. (PMA Ins. Co.)*, 784 A.2d 866 (Pa.Cmwlth. 2001). Here, Provider timely filed its fee review application within 30 days of Employer's EOB disputing treatment. Hr'g Officer's Op., Conclusion of Law (C.L.) No. 4.

Hearing Officer next addressed the principal issue of whether Claimant's condition and assessment qualified for level I trauma transport and hospital admission/treatment. "A decision by ambulance personnel that an injury is life threatening or urgent shall be presumptive of the reasonableness and necessity of the transport to a trauma center or burn facility, unless there is clear evidence of violation of the ACS triage guidelines." 34 Pa.Code

§ 127.128(d); Hr'g Officer Op., C.L. No. 5. If the patient is initially transported to the trauma center in accordance with ACS triage guidelines, payment for transportation to the trauma center, and payments for the full course of acute care services by all trauma center personnel, and all individuals authorized to provide patient care in the trauma center, shall be at the provider's usual and customary charge for the treatment and services rendered. 34 Pa. Code § 127.128(c); Hr'g Officer Op., C.L. No. 6.

Hearing Officer determined Claimant's injuries warranted level I trauma transport and hospital admission/treatment under the ACS triage guidelines. He observed that Claimant exceeded the age criterion (55 years) in Step Four of the ACS Guidelines by 17 years. *Id.* However, Hearing Officer recognized that Step Four directs only that EMS personnel contact medical command and consider transport to a trauma center if any Step Four conditions exist. To that end, however, Hearing Officer found that the EMS reports indicate EMS personnel contacted medical command as per the ACS guidelines.

Although the EMS report is unclear as to whether EMS personnel exercised their own judgment in transporting Claimant to Hospital, Hearing Officer reasoned that the record otherwise contained sufficient evidence to validate EMS' trauma center transport. The EMS report indicated Claimant complained of severe back pain after falling on ice, which could be indicative of spinal injuries. These are life-threatening conditions for an elderly patient. Hearing Officer ultimately determined, "Provider necessarily prevails in this instance since Employer has not presented clear evidence of a violation of the ACS triage guidelines." Hr'g Officer Op. at 11. Accordingly, Hearing Officer determined the trauma center exemption from the Act's medical fee caps applied; thus, Employer must pay Provider 100 percent of its charges for the treatment it rendered to Claimant at Hospital. Employer petitions for review.

## II. Issues

Employer presents three issues for review.[5] It contends Hearing Officer: erred in failing to dismiss Provider's fee review application as untimely under Section 306(f.1)(5) of the Act, 77 P.S. § 531(5); erred in failing to reverse the Bureau's fee review decision because competent and credible evidence produced at hearing showed Claimant's injury did not constitute "immediately life-threatening" or "urgent" injuries for purposes of 34 Pa.Code § 127.128; and violated Employer's constitutional right to due process by precluding Employer from presenting expert medical testimony by telephone at the fee review hearing.

## III. Discussion

### A. Timeliness

#### 1. Argument

Employer first contends Hearing Officer failed to dismiss Provider's fee review application as untimely under Section 306(f.1)(5) of the Act because it was filed on November 19, 2009, more than 90 days after Provider submitted its bill to Employer. Section 306(f.1)(5) provides in relevant part (with emphasis added):

---

5. Our standard of review is limited to determining whether Hearing Officer's findings are supported by substantial evidence and whether Hearing Officer erred or violated Employer's constitutional rights. *Fid. & Guar. Ins. Co. v. Bureau of Workers' Comp. (Cmty.Med.Ctr.)*, 13 A.3d 534 (Pa.Cmwlth. 2010).

A provider who has submitted the reports and bills required by this section and who disputes the amount or timeliness of the payment from the employer or insurer shall file an application for fee review with the department *no more than thirty (30) days following notification of a disputed treatment* or ninety (90) days following the original billing date of treatment.

77 P.S. § 531(5).

Employer cites two cases in support of its argument. In *Temple University Hospital v. Department of Labor and Industry*, 873 A.2d 780 (Pa.Cmwlth.2005), the provider submitted a bill to Kemper Insurance for $106,119.81 in May 2001. Three days later, Kemper issued checks for $20,190.69 and $13,965.65. The provider accepted the checks. Along with the checks, Kemper sent audit forms that explained its review of the charges and notification of the amount it determined reimbursable. The audit forms also listed American Protection Agency (American) as the carrier. However, they directed that all future bills for the claimant be sent to Kemper.

A year later, the provider sent a bill to American for $71,963.47, the amount not paid by Kemper. Ultimately, this Court held the provider had 90 days from the date it originally billed Kemper, a date later than 30 days after Kemper disputed the bill, to file a fee review application. Therefore, the provider's fee review application was time-barred.

In *Thomas Jefferson University Hospital v. Bureau of Workers' Compensation Medical Fee Review Hearing Office*, 794 A.2d 933 (Pa.Cmwlth.2002), the provider initially billed the insurer in August 1997. The insurer never responded. In August 1999, the provider filed a fee review application. Ultimately, this Court held the provider failed to establish the insurer actually disputed liability and thus the provider had 90 days from its original August 1997 billing date to file a fee review application. Therefore, the Bureau properly dismissed the provider's 1999 fee review application as untimely.

Here, Employer argues, prior to April 2010, it did not dispute that Claimant's injuries were immediately life-threatening or urgent. Therefore, Provider had 90 days from its May 2009 billing date to file a fee review application. Hearing Officer erred in failing to dismiss Provider's November 2009 fee review application as untimely.

### 2. Analysis

■ A provider seeking review of a fee dispute must file a fee review application no more than 30 days following notification of disputed treatment or 90 days following the original billing date for the treatment subject to the fee dispute, whichever is later. 34 Pa.Code § 127.252(a); *Fid. & Guar. Ins. Co.* Here, Employer paid $142,196.00 in November 2009. R.R. at 878a. Employer's November 2009 EOB, which explained why it paid the reduced amount for Claimant's inpatient hospital care, qualified as notification of disputed treatment. *See Pittsburgh Mercy Health Sys. v. Bureau of Workers' Comp. Fee Review Hearing Office (U.S.Steel Corp.)*, 980 A.2d 181 (Pa.Cmwlth.2009) (insurer's explanation of review serves as notification of disputed treatment for purposes of Section 306(f.1)(5)). Therefore, Provider had 30 days from Employer's EOB to file a fee review application. It did so well within this period.

In addition, *Temple University* and *Thomas Jefferson University* are inapposite. In *Temple University*, the provider had 90 days from its original billing date (which was more than 30 days from receipt of Kemper's May 2001 audit/explanation of review) to file a fee review application.

However, the provider failed to do so. In *Thomas Jefferson University*, the insurer did not file an audit report or explanation of review disputing its liability for treatment. Therefore the 30–day period following notification of disputed treatment was inapplicable.

For these reasons, we discern no error in Hearing Officer's conclusion that Provider timely filed its fee review application within 30 days of Employer's EOB disputing Provider's treatment. 34 Pa.Code § 127.252(a); *Fid. & Guar. Ins. Co.*; *Pittsburgh Mercy Health Sys.*

### B. Trauma Center Exemption

#### 1. Argument

Employer next contends Hearing Officer erred in failing to properly apply the criteria in 34 Pa.Code § 127.128 for determining whether a provider is entitled to the trauma center exemption from the fee caps. With respect to the initial decision to transport Claimant to a level I trauma center, Employer points out that Claimant did not meet any of the criteria in Steps One through Three of the ACS triage guidelines.

As to Step Four, Employer asserts that the only criterion Claimant met was his age. However, age, by itself, does not require transfer to a trauma center. At the time of transport, the EMS personnel did not know Claimant sustained two vertebral fractures in the fall or that he suffered from pre-existing ankylosing spondylitis. Although Hospital's physicians later diagnosed these conditions, Employer argues the applicable regulation provides that a determination of whether a condition is immediately life-threatening must be based on information available at the initial assessment. 34 Pa. Code § 127.128(d). Therefore, Employer argues, Claimant's ultimate diagnosis is irrelevant, and Provider cannot rely on conditions diagnosed thereafter.

Employer further contends the medical evidence adduced at hearing only established that Claimant's condition was potentially, not immediately, life-threatening or urgent. It asserts Hospital initially triaged Claimant's condition on arrival as patient acuity level 3, which is potentially life-threatening or urgent. *See* Nurses' Clinical Report, 01/07/09; R.R. at 888a–89a. The trauma care exemption regulation requires an immediately life-threatening or urgent injury. 34 Pa.Code § 127.128(a)(1). Further, Employer stresses that Claimant's physicians waited two days to perform surgery on Claimant. Therefore, Employer argues, because Claimant did not actually have immediately life-threatening or urgent injuries, Hearing Officer erred in determining Claimant's condition met the requirements of the trauma center exemption from the Act's medical fee caps.

Employer further argues our decision in *Laundry Owners Mutual Liability Insurance Association v. Bureau of Workers' Compensation (UPMC)*, 853 A.2d 1130 (Pa.Cmwlth.2004) is instructive here. In *Laundry Owners*, the claimant suffered severe injuries in a head-on collision, including multiple fractures of his arms, legs and hip. His injuries were immediately life-threatening, not potentially life-threatening. After the provider cleared the claimant for discharge to a transitional facility, he remained at the trauma center for several days until a bed became available at the transitional facility. On appeal, we determined the trauma center exemption no longer applied as of the date the claimant was cleared for discharge to a non-acute facility. Here, Employer argues, the evidence shows Claimant's injuries were never immediately life-threatening during his stay at Hospital.

## 2. Analysis

We discern no error in Hearing Officer's determination that Claimant's work injuries were immediately life-threatening or urgent for purposes of the trauma center exemption in Section 306(f.1)(10) of the Act, 77 P.S. § 531(10). Hearing Officer determined Claimant's injuries met the criteria in Step Four of the ACS triage guidelines for EMS transport to a trauma center. He found Claimant's advanced age, his complaints to EMS of severe back pain after falling on ice, EMS' contact with medical command, and EMS' judgment, collectively warranted transfer to a trauma center. F.F. Nos. 3, 4, 5. Hearing Officer's findings are supported by the EMS report. *See* R.R. at 879a–80. Further, Claimant's age, complaints of severe back pain after a fall, and contact with medical command are all factors identified in Step Four of the ACS triage guidelines as justifying an EMS decision to transport Claimant to a trauma center. *See id.* at 957a.

■ A decision by EMS personnel that an injury is immediately life-threatening or urgent, absent a clear violation of the ACS guidelines, is presumptive of the reasonableness and necessity for the transport to a trauma center. 34 Pa.Code § 127.128(d). As discussed above, the EMS personnel acted within their discretion under the ACS triage guidelines. Therefore, we reject Employer's contention that the EMS unit's decision to transport to a level I trauma center violated the ACS triage guidelines.

Further, "[i]f the patient is initially transported to the trauma center in accordance with the [ACS] triage guidelines, payment for transportation to the trauma center . . . and payments for the full course of acute care services by all trauma center . . . personnel, and all individuals authorized to provide patient care in the trauma center . . . shall be at the provid-

er's usual and customary charge for the treatment and services rendered." 34 Pa. Code § 127.128(c); *Laundry Owners.*

■ Regarding Claimant's hospital admission and treatment, Hearing Officer credited Provider's Physician's testimony that, upon examination in the emergency room by the trauma service, Hospital admitted Claimant as a trauma patient and placed him in the Trauma–Neuro ICU. Hr'g Officer Op., F.F. No 6; Notes of Testimony (N.T.), 09/07/10, at 97–98; R.R. at 1061a–62a. Claimant's injuries included two unstable spinal fractures. F.F. No. 7; N.T. at 87, 98–99; R.R. at 1051a, 1062a–63a. Provider's Physician testified these injuries can be considered life-threatening. F.F. No. 8; N.T. at 83, 99; R.R. at 1047a, 1063a. Claimant remained a trauma patient throughout his stay at Hospital. F.F. No. 8; N.T. at 98; R.R. at 1062a.

The ACS guidelines for inter-hospital transfer recognize spinal fractures as life-threatening injuries requiring transfer to a level I or level II trauma center. R.R. at 961a. The trauma center exemption applies to such transfers. 34 Pa.Code § 127.128(e). Therefore, in addition to EMS' decision to transport Claimant to a level I trauma center, Claimant's diagnosis at Hospital also indicated that he had immediately life-threatening or urgent injuries requiring treatment at a level I trauma center.

Finally, Employer's reliance on *Laundry Owners* is misplaced. The claimant's initial admission and treatment in *Laundry Owners* fell within the trauma exemption from the Act's medical fee caps. Later, however, the claimant was cleared for discharge to a non-acute care facility, but there were no beds available. As a result, the claimant remained at the trauma center for reasons unrelated to a continued need for acute care. This Court held the

trauma center exemption no longer applied as of the date the claimant was cleared for discharge to a non-acute facility. *Id.* Here, however, Claimant remained a trauma patient throughout his entire stay at Hospital.

For these reasons, we hold Hearing Officer properly determined Employer must pay Provider 100 percent of its charges for its treatment of Claimant at Hospital. Section 306(f.1)(10) of the Act; 34 Pa.Code § 127.128; *Laundry Owners.*

### C. Procedural Due Process

#### 1. Argument

Employer next argues Hearing Officer violated its constitutional guarantee of due process by precluding testimony from Employer's Physician on the basis that Employer failed to comply with an internal rule of the Fee Review Hearing Office. The hearing notice provided in pertinent part:

1.  If a party and/or their witnesses is unable to appear in person for the hearing and wished to appear and/or testify by telephone, the party requesting telephone participation must contact the **OPPOSING** party to obtain their **CONSENT** to conducting the hearing by telephone and/or receiving witness testimony by telephone.

2.  After receiving consent for telephone participation, **EACH** party requesting telephone participation shall file written notice of same with the Hearing Officer **NO LATER THAN** three (3) business days prior to the scheduled hearing, supplying therein the name, telephone number, and location of all participants via telephone.

3.  **EACH** party requesting telephone participation shall forward their **PROPOSED EXHIBITS** to the Hearing Officer **AND** the opposing party **NO LA-TER THAN** three (3) business days prior to the scheduled hearing date.

. . . .

**NOTICE:** FAILURE TO COMPLY WITH THESE INSTRUCTIONS MAY RESULT IN DENIAL OF THE OPPORTUNITY TO PARTICIPATE BY TELEPHONE.

R.R. at 818a.

In August 2010, Employer submitted a pre-hearing filing identifying Insurance Auditor as its only expert witness and submitted his report. *Id.* at 829a–35a. Employer made no other prehearing submissions and did not identify *any* witnesses to be presented by telephone.

On September 1, 2010, six days before the hearing, Provider submitted its pre-hearing filing which sought permission to present Provider's medical expert's testimony by telephone. *Id.* at 837a–39a. Hearing Officer granted Provider's request. *Id.* at 840a.

At hearing, however, Employer sought to submit telephone testimony from Employer's Physician. N.T. at 16–20; R.R. at 980a–84a. Employer's counsel acknowledged that prior counsel did not list Physician as an expert in its pre-hearing filing. N.T. at 16; R.R. at 980a. Provider objected on the grounds that Employer Physician would be testifying by telephone and Employer did not identify him as a witness prior to the hearing. N.T. at 17; R.R. at 981a. Hearing Officer sustained Provider's objection solely on the basis that Employer did not request leave to present his testimony prior to the hearing "as per the directions in the hearing notice." N.T. at 20; R.R. at 984a.

On appeal, Employer asserts nothing in the MCC regulations requires that parties to a fee review hearing disclose the identity of an expert witness or the substance of the witness's testimony and opinions prior

to the hearing. Thus, Employer contends Provider cannot show any prejudice in this case. Employer also contends it suffered prejudice by not being afforded a full opportunity to present evidence in support of its burden of proof. In particular, Employer asserts Hearing Officer permitted Provider to present medical evidence that Employer could not contradict or rebut.

Due process principles, Employer asserts, apply to administrative proceedings. *Kowenhoven v. County of Allegheny*, 587 Pa. 545, 901 A.2d 1003 (2006). These principles require an opportunity to fully participate in the proceedings and to present evidence on one's own behalf. *Id.* Further, all parties must be given an opportunity to offer evidence in rebuttal of an opposing party's evidence. *Interstate Commerce Comm'n v. Louisville & Nashville R.R. Co.*, 227 U.S. 88, 33 S.Ct. 185, 57 L.Ed. 431 (1913).

### 2. Analysis

 Despite the telephone participation and hearing instructions, Employer did not identify any witnesses who would testify by telephone in its prehearing filing. Moreover, Employer identified Insurance Auditor as its only witness. *See id.* at 829a–35a. For this reason, Hearing Officer did not abuse his discretion in sustaining Provider's objection to Employer's request to present telephone testimony from a previously unidentified medical expert. *See Capital BlueCross v. Pa. Ins. Dep't*, 937 A.2d 552 (Pa.Cmwlth.2007), *appeal denied sub nom., Sklaroff v. Ario*, 600 Pa. 106, 963 A.2d 906 (2009) (hearing officer did not abuse his discretion by ruling that physician, who did not timely identify himself as a witness prior to hearing, could not testify in post approval adjudicatory hearing).

Further, due process requires a person be provided notice and an opportunity to be heard. *Burch v. Dep't of Pub. Welfare*, 815 A.2d 1143 (Pa.Cmwlth. 2003). It does not, however, confer an absolute right to be heard. *Id.* Had Employer complied with the procedures in the Bureau's notice of hearing, it could have presented its Physician's testimony. *Id.* Further, Hearing Officer's denial of Employer's request in no way deprives Employer of its opportunity to be heard. *See Pa. Sav. Ass'n v. Dep't of Banking*, 105 Pa.Cmwlth. 175, 523 A.2d 837 (1987) (agency properly exercised its discretion in denying party's request at hearing that a witness be made available for oral examination where that party failed to include the witness in its prehearing witness list; the denial of the untimely request did not deprive the party of an opportunity to be heard).

Therefore, we reject Employer's contention that Hearing Officer violated Employer's due process rights by precluding telephone testimony from Employer's Physician. *Capital BlueCross; Burch; Pa. Sav. Ass'n.*

### IV. Conclusion

For the above reasons, we discern no error in the Hearing Officer's decision upholding the Bureau's administrative order directing Employer to pay Provider 100% of charges for its treatment of Claimant at Hospital. Accordingly, we affirm.

### *ORDER*

**AND NOW,** this 28th day of October, 2011, the order of the Bureau of Workers' Compensation Fee Review Hearing Officer is **AFFIRMED.**